*In re* MARRIAGE OF GLORIA J. GUNTER, Petitioner-Appellant, and BOBBY G. GUNTER, Respondent-Appellee.

First District (5th Division)    No. 80-791

■■■

Opinion filed March 6, 1981.

Darryl R. Lem and Robert C. Collins, Jr., both of Calumet City, for appellant.

Myron E. Greenbaum and Joel S. Kasanov, both of Greenbaum & Leavitt, of Chicago, for appellee.

Mr. JUSTICE LORENZ delivered the opinion of the court:

Petitioner, Gloria Gunter, appeals from an order of the circuit court modifying a judgment for dissolution of marriage to award respondent, Bobby Gunter, permanent custody of the parties' two minor children. On appeal, she raises the following issues: (1) that the trial court's decision to modify custody is contrary to the manifest weight of the evidence; and (2) that the trial court erred in permitting examination of petitioner's current spouse under section 60 of the Illinois Civil Practice Act (Ill. Rev. Stat. 1979, ch. 110, par. 60).

On January 2, 1979, a judgment for dissolution of marriage was entered dissolving the marriage of petitioner and respondent and awarding custody of their daughters Sylvia, 9 years old, and Sherry, 7 years old, to petitioner.

Respondent filed a petition on June 5, 1979, alleging that petitioner had entered into an adulterous relationship with one Edward Peters and had removed the parties' children from the jurisdiction. He requested both a rule to show cause why his former wife should not be held in contempt and a transfer of the children's custody to him. After a hearing, the trial court awarded temporary custody to respondent.

Subsequently, on December 13, 1979, a hearing was held on the issue of permanent custody. On January 3, 1980, the trial court entered an order as a result of this hearing transferring permanent custody of the children to respondent. On February 19, 1980, the order was modified to include specific findings of fact with respect to the custody determination. Those findings were as follows: (1) there was reason to believe that the children's present environment (in the custody of petitioner and Peters) seriously endangered their physical, mental, moral or emotional health and the harm likely to be caused by a change of environment is outweighed by advantages to the children; (2) petitioner had entered into a bigamous marriage with Peters and continued to reside with him after discovering he was still married to another person; (3) petitioner's marriage to Peters constituted a change in circumstances requiring a modification of the custody arrangement for the children's best interest; and (4) Peters has certain flaws in his personality which could cause serious harm to the children. Petitioner appeals.

In order to determine the propriety of these findings, it is necessary to review the pertinent evidence adduced at the custody hearing.

On March 17, 1979, about two months after the dissolution of the marriage between petitioner and respondent, petitioner married Peters. One week later, on March 24, 1979, petitioner and the minor children moved, without leave of court, from the former marital home in Berwyn, Illinois, to Peters' residence in Griffith, Indiana. When she and Peters

returned to the Berwyn home a few days later to gather some personal belongings, they discovered that the locks on the house had been changed. They gained entrance to the house through a garage door. Shortly thereafter, respondent appeared at the scene. He struck Peters, kicked him in the ribs, and slapped petitioner. As a result, respondent was arrested, pleaded guilty to the offense of battery, and was convicted and fined.

Petitioner discovered in April of 1979 that her new spouse, Peters, was still married to his fourth wife. Nevertheless, she and her two daughters continued living with him and his daughter from a previous marriage in his Indiana home. The court transferred temporary custody of the two children to respondent after the June 5, 1979, hearing. During the time that the children lived in Indiana, respondent was denied visitation rights because of petitioner's fears of an altercation between respondent and Peters.

On weekdays, petitioner and Peters worked outside the home and did not usually return until about 5:30 p.m. As a result, the children were required to attend a day-care center after school until they were picked up after work. The children prospered while in school in Indiana and, according to petitioner, interacted well with Peters while at home. Peters' home was a rather large three bedroom apartment which included a living room, dining room, kitchen, family room and two-car garage.

Peters had met petitioner at his place of employment. He occupied a position as a territorial sales manager and was considered by his employer as an excellent, well-adjusted employee. Others viewed Peters in a less favorable light. One co-employee, Lenore Rath, testified that Peters, upon returning from a trip to the Bahamas in the summer of 1975, bragged about the "wild sex parties" that had occurred and brought back pictures showing himself with a naked girl. Peters also offered to supply pornographic films for an office party. On one occasion, Rath visited Peters in his home in February of 1978 when he was married to Diane Anderson, his fourth wife. While there she noticed that he treated his daughter from another marriage, Ann, with indifference. On another occasion, Rath attended a New Year's Eve party at Peters' home. He told Rath that he only married Diane for her money and "to take care of Annie." He also stated, "I've got somebody else who's going to have money, too."

Diane Anderson and her 17-year-old daughter, Susan, also had unfavorable opinions with respect to Peters' character. While living with them he consumed at least six beers on a daily basis and frequently used profane language in their presence. One September evening in 1977, Peters and Susan entered into a disagreement concerning the use of the

car. He approached her brandishing a knife and demanded the car keys. Then, he grabbed her and shook the keys out of her hands. On another occasion, Susan overheard a phone conversation between Peters and another woman. After learning that Susan related what she had heard to her mother, Peters ordered her to leave the house. Accusing Susan of spreading falsehoods about his imaginary "affair" with this other woman, he told her what she "[Susan] needed was a good f___." Susan was forced to eventually move out and reside with her father.

According to his own testimony, Peters, 35 years old, had been married a total of five times and had committed bigamy twice. He admitted deceiving petitioner into believing that he was divorced from his fourth wife when he married her in March of 1979, but added that he and petitioner were remarried in August of 1979 following the divorce of his former spouse. Peters also admitted that he drove his automobile with the knowledge that his license was suspended. As to the incident with Susan Anderson concerning the car keys, he denied striking or threatening her in any fashion. His relationship with his daughter, Ann, was allegedly a good one, and she fared well with petitioner's daughters when they lived together.

From the time that temporary custody was transferred to respondent until the present, respondent and the children have resided with his parents and sister in a three-bedroom home in Countryside, Illinois. While respondent works during the day, the children attend school, and until he returns home in the late afternoon, his mother is entrusted with their care. In the evenings, they all share a family supper. Respondent then supervises the children's homework duties. The two children share one bedroom, the grandparents occupy one bedroom, and their daughter has the use of the third. Respondent sleeps in a day-bed in the living room. His daughters' extracurricular activities include going to movies, participating in church functions and Girl Scouts, and attending piano lessons. The children have a healthy relationship with their father and have expressed a preference to continue living with him. Respondent does not drink alcoholic beverages.

Petitioner contends that the trial court's findings do not support its decision to transfer permanent custody from petitioner to respondent and are contrary to the manifest weight of the evidence.

■■ Section 610 of the Illinois Marriage and Dissolution Act (Ill. Rev. Stat. 1979, ch. 40, par. 610) (the Act) governs actions for modifications of custody judgments sought within two years of their entry. It provides in relevant part as follows:

> (a) No motion to modify a custody judgment may be made earlier than 2 years after its date, unless the court permits it to be

made on the basis of affidavits that there is reason to believe the child's present environment may endanger seriously his physical, mental, moral, or emotional health.

(b) The court shall not modify a prior custody judgment unless it finds, upon the basis of facts that have arisen since the prior judgment or that were unknown to the court at the time of the entry of the prior judgment, that a change has occurred in the circumstances of the child or his custodian and that the modification is necessary to serve the best interest of the child. In applying these standards the court shall retain the custodian appointed pursuant to the prior judgment unless:

(1) the custodian agrees to the modification;

(2) the child has been integrated into the family of the petitioner with consent of the custodian; or

(3) the child's present environment endangers seriously his physical, mental, moral or emotional health and the harm likely to be caused by a change of environment is outweighed by its advantages to him." (Ill. Rev. Stat. 1979, ch. 40, par. 610(a), (b)(1), (2), (3).)

This section reflects an underlying policy favoring the finality of child custody judgments and creating a presumption in favor of the present custodian in order to promote stability and continuity in the child's custodial and environmental relationships. (*In re Custody of Harne* (1979), 77 Ill. 2d 414, 396 N.E.2d 499; *In re Custody of La Marca* (1979), 78 Ill. App. 3d 26, 397 N.E.2d 31.) To this end, a prior custody judgment will not be modified unless it is consistent with the child's best interests and a demonstrable change in circumstances of the child or the custodian has occurred along with one of three conditions precedent. (See Ill. Rev. Stat. 1979, ch. 40, par. 610(b)(1), (2), (3); *In re Custody of Iverson* (1980), 83 Ill. App. 3d 493, 404 N.E.2d 411.) In making this determination, the discretion afforded the trial court is such that a reviewing court will not disturb its decision unless it was against the manifest weight of the evidence or manifest injustice will result. (*Blonsky v. Blonsky* (1980), 84 Ill. App. 3d 810, 405 N.E.2d 1112.) We find no abuse of discretion by the trial court in this case, and conclude that its decision to modify custody is amply supported in the record.

■■ ■ Petitioner's bigamous marriage to Peters was a change in circumstances of the children or their custodian that seriously endangered the children's physical, mental, moral or emotional health. (See Ill. Rev. Stat. 1979, ch. 40, par. 610(b)(3).) Bigamy and the marriage to a bigamist are offensive to Illinois public policy and violate our criminal code. (Ill. Rev. Stat. 1979, ch. 38, pars. 11—12, 11—13.) Furthermore, this conduct contravenes the purposes of the Act and the legislature's desire to

strengthen and preserve the integrity of marriage and safeguard family relationships. (See Ill. Rev. Stat. 1979, ch. 40, par. 102(2); *Hewitt v. Hewitt* (1979), 77 Ill. 2d 49, 394 N.E.2d 1204.) In *Jarrett v. Jarrett* (1980), 78 Ill. 2d 337, 400 N.E.2d 421, our supreme court upheld a trial court's determination to modify custody predicated upon the open and continuous cohabitation of the mother of the children with her boyfriend, in violation of a fornication statute even in the absence of tangible evidence of contemporaneous adverse effect upon the children. There, the court found that the moral values displayed by the mother to her children and those expected in the future offended public policy and endangered the children's moral development. Although *Jarrett* provides us with guidance in evaluating the effect of a bigamous relationship on the children, we need not decide whether the bigamous nature of the marriage alone jeopardized the children's moral health since we find that other aspects of the new relationship subjected them to more tangible harm.

In this case, the testimony revealed that Peters was a very unstable individual. Besides committing bigamy twice during the course of his five marriages, he consumed great amounts of alcoholic beverages, treated one of his daughters with indifference and exhibited violent tendencies toward the daughter of a former spouse. In addition, he commonly used profane language in the presence of his child and former spouse. The record, as a whole, supports the trial court's conclusion that Peters had certain "flaws" in his personality that could cause serious harm to the children. The trial court was correct in finding that petitioner's marriage to Peters was an important consideration in modifying the custody decree. See *Kjellesvik v. Shannon* (1976), 41 Ill. App. 3d 674, 355 N.E.2d 120.

Moreover, the children were afforded a more stable environment with respondent than with petitioner and Peters. In contrast to their original arrangements where they remained in a day-care center after school until dinnertime, the children are presently supervised by respondent's parents at their home until respondent arrives in the late afternoon. Their extracurricular activities now include civic, church and family-related functions which are conducive to their well-being. Finally, respondent does not use profane language in their presence or consume any alcoholic beverages as does petitioner's current spouse. This perhaps explains the children's preference to live with their father.

■■ Petitioner removed the children from the State, without leave of court, in order to live with Peters and to be closer to her place of employment. While we are aware that removal of a child from the jurisdiction is not alone sufficient grounds for a change of custody (*see In re Custody of Nodot* (1980), 81 Ill. App. 3d 883, 401 N.E.2d 1189), this conduct indicates that petitioner placed her children in a secondary

position to that of her new husband and career, and supports the trial court's determination to modify custody.

Based upon the foregoing, we conclude that the trial court's ruling to modify custody of the minor children from petitioner to respondent is not contrary to the manifest weight of the evidence.

Petitioner also contends that the trial court committed reversible error in permitting counsel for respondent to examine Peters as an adverse witness under section 60 of the Illinois Civil Practice Act, which provides:

> "Upon the trial of any case any party thereto *or any person for whose immediate benefit the action is prosecuted or defended,* or the officers, directors, managing agents or foreman of any party to the action, may be called and examined as if under cross-examination at the instance of any adverse party. The party calling for the examination is not concluded thereby but may rebut the testimony thus given by countertestimony and may impeach the witness by proof of prior inconsistent statements." (Emphasis added.) (Ill. Rev. Stat. 1979, ch. 110, par. 60.)

According to petitioner, Peters was not a witness who falls within the ambit of this statute.

■■ We agree with petitioner that the trial court erred in allowing Peters to be called for adverse examination. A plain reading of section 60 reveals that "any person for whose immediate benefit the action is prosecuted or defended" may be called for adverse examination. Although Peters would have benefited from a decision in petitioner's favor, his gain would have merely been incidental, not "immediate," as the statute requires. Obviously, the children faced the possibility of living with their mother *and* Peters if petitioner had prevailed at the permanent custody hearing. (Emphasis supplied.) We have held that Peters' role in the proceeding was, indeed, an important one since his personality necessarily shaped the children's environment. Along with the influence he provided them, the children assuredly would have benefited Peters by giving him their love and affection. However, this action was litigated for the "immediate" benefit of petitioner, the children's mother. She and respondent are the only parties to this action. Section 60 is narrow in scope and allows adverse examination of witnesses who are "immediately" not incidentally benefited by the action. Therefore, Peters' testimony was improperly adduced under this section.

■■ In light of the substantial evidence in the record that supports the trial court's decision in the absence of Peters' testimony, though, we find the error in allowing his adverse examination to be harmless. Testimony from other witnesses conclusively establishes that Peters was unstable and he exposed the children to an environment that seriously endangered their "physical, mental, moral or emotional health." We have previously

outlined this testimony and see no reason to duplicate our efforts in this regard. Suffice it to say that any additional evidence gained by the testimony of Peters under adverse examination was cumulative and would not have altered the trial court's decision.

For the reasons stated, the judgment of the circuit court is affirmed.

Affirmed.

SULLIVAN, P. J., and WILSON, J., concur.